## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | **Chapter 13** |
| | : | |
| **JOSEPH L. LASPINA,** | : | |
| | : | **Bankruptcy No. 18-11012-AMC** |
| **DEBTOR** | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

### I.    INTRODUCTION

The debtor, Joseph L. LaSpina ("Debtor"), objects to the proof of claim ("Claim") filed by his ex-wife, Cynthia L. Stewart ("Ms. Stewart"), in the amount of $91,948.18 as a priority unsecured claim pursuant to 11 U.S.C. § 507(a)(1)(A) based upon an award that Ms. Stewart received in the parties' divorce proceedings which she characterizes as a nondischargeable domestic support obligation. Debtor argues that the underlying award actually constitutes an equitable distribution award and, therefore, the Claim should be reclassified as a general unsecured claim subject to discharge.

After consideration of the special master's intent in fashioning the underlying award in the parties' divorce proceedings, the Court finds that two-thirds of the Claim should be reclassified as a general unsecured claim subject to discharge, because the special master intended most of the award to serve as an equitable distribution of the parties' marital property. However, one-third of the Claim is properly characterized as a nondischargeable, priority claim, because the special master intended part of the award to serve as a domestic support obligation. Accordingly, the Court will sustain the Debtor's objection to the Claim, in part, and overrule it in part.

1

## II.    FACTUAL/PROCEDURAL BACKGROUND

After the birth of their son in April 1992, the Debtor and Ms. Stewart married on July 29,

1994. Ex. C-1 p. 2 ¶¶ 1, 4. During their marriage, the Debtor owned and operated his own

business, Hairworks Unlimited d/b/a LaSpina Salon and Spa ("LaSpina Salon"), which he had

established prior to the marriage. *Id.* at p. 3 ¶ 7, p. 4 ¶ 8, p. 16 ¶ 14. For most of their marriage,

Ms. Stewart worked full-time as a licensed practical nurse ("LPN") while serving as the primary

caregiver for their son, allowing the Debtor to work six days per week. *Id.* at p. 9 ¶ 4; Hrg. Tr.

15:17-16:13, 17:8-13, June 4, 2019 ("June 4 Tr.").

In September 2004, the Debtor moved one of the locations of LaSpina Salon to a larger

facility. Ex. C-1 p. 4 ¶ 9. The Debtor invested $160,000, consisting of a $50,000 line of credit

and $110,000 of marital assets and income, into renovating the new location. *Id.* at p. 4 ¶ 9, p. 10

n.7.

On April 6, 2005, Ms. Stewart, represented by counsel, filed a complaint in divorce in the

Chester County Court of Common Pleas ("State Court") against the Debtor. *Id.* at p. 1, p. 2 ¶ 5.

She did not file a request for alimony pendente lite[1] or spousal support. June 4 Tr. 22:20-22; Hrg.

---

[1] "Alimony pendente lite" is defined by 23 Pa.C.S.A. § 3103 as "an order for temporary support granted to a spouse
during the pendency of a divorce or annulment proceeding." Pursuant to 23 Pa.C.S.A. § 3702(a), "in proper cases,
upon petition, the court may allow a spouse reasonable alimony pendente lite, spousal support and reasonable
counsel fees and expenses. Reasonable counsel fees and expenses may be allowed pendente lite..." Pennsylvania
courts have recognized:

> [Alimony *pendente lite*] is designed to help the dependent spouse maintain the standard of living
> enjoyed while living with the independent spouse. Also, and perhaps more importantly, [alimony
> *pendente lite*] is based on the need of one party to have equal financial resources to pursue a
> divorce proceeding when, in theory, the other party has major assets which are the financial
> sinews of domestic warfare. [Alimony *pendente lite*] is thus not dependent on the status of the
> party as being a spouse or being remarried but is based, rather, on the state of the litigation....
> [T]he purpose of [alimony *pendente lite*] is to provide the dependent spouse equal standing during
> the course of the divorce proceeding.... [Alimony *pendente lite*] focuses on the ability of the
> individual who receives the [alimony *pendente lite*] during the course of the litigation to defend
> her/himself, and the only issue is whether the amount is reasonable for the purpose, which turns on
> the economic resources available to the spouse. *Cook v. Cook*, 186 A.3d 1015, 1022-23 (Pa.
> Super. Ct. 2018) (quoting *Schenk v. Schenk*, 2005 PA Super 266, 880 A.2d 633, 644–645 (Pa.
> Super. Ct. 2005)).

Tr. 29:19-24, July 23, 2019 ("July 23 Tr."). That same month, the Debtor moved out of the

parties' five-bedroom marital residence located at 605 Dilworth Road, Downingtown,

Pennsylvania ("Marital Residence"). Ex. C-1 p. 2 ¶ 2, p. 4 ¶¶ 10-11. Upon Ms. Stewart's request,

a special master, Lynn A. Snyder ("Special Master"), was appointed on May 23, 2006. *Id.* at p. 1.

Although the Debtor and Ms. Stewart had agreed that the Debtor would receive credit

towards child support payments for every mortgage payment that he made related to the Marital

Residence, the Debtor stopped paying "support" in the form of mortgage payments at some

point. *Id.* at p. 4 ¶ 11; July 23 Tr. 13:16-18, 55:24-56:9. As a result, Ms. Stewart could not afford

the mortgage payments on her own and, in August 2006, Ms. Stewart moved out of the Marital

Residence. Ex. C-1 p. 4 ¶ 11. At the time that Ms. Stewart moved out, the Debtor "had support

arrearages in excess of $17,000." *Id.* at p. 10 ¶ 7. These support arrearages most likely refer to

child support, as Ms. Stewart never sought spousal support and the Debtor was only ordered to

pay child support. July 23 Tr. 20:22-21:2, 29:19-24, 56:4-6, 59:5-6, 68:2-23.

As of January 2007, foreclosure proceedings on the Marital Residence had commenced.

Ex. C-1 p. 5 ¶ 11. Subsequently, Ms. Stewart's boyfriend, Michael Bruno ("Mr. Bruno"), who

was an accountant, made an offer to purchase the Marital Residence for $360,000, which the

Debtor accepted. *Id.* at p. 5 ¶ 12, p. 8 ¶ 3. The Debtor and Ms. Stewart realized no net proceeds

from the sale. *Id.* at p. 5 ¶ 12. Ms. Stewart moved back into the Marital Residence one week after

Mr. Bruno closed on the purchase. *Id.*

On September 16, 2008, the Special Master held a trial with Ms. Stewart, the Debtor, and

their counsel ("Trial"). *Id.* at p. 1. The Trial concluded on October 2, 2008. *Id.* Subsequently, on

December 29, 2008, the Special Master submitted a report of her findings and recommendations

to the State Court ("Report"). *See id.*

In the section of the Report entitled "Merits of Related Claims," the Special Master noted

that, at the time of the Trial, Ms. Stewart was living with Mr. Bruno, who was then her fiancé,

and retained primary custody of the parties' minor son.[2] *Id.* at p. 7 ¶¶ 27-28. Ms. Stewart was

employed in two part-time nursing positions and typically worked over forty hours per week

making approximately \$42,000 per year.[3] *Id.* at p. 3 ¶ 6. However, at the time of Trial, she was

on temporary medical leave from one of her positions due to a diagnosis of Lyme's Disease, but

anticipated returning to work "in the not to [sic] distant future." *Id.* at p. 3 ¶¶ 4, 6, p. 8 ¶ 3.

The Report also reflected that the Debtor was in "good health" at the time of Trial, still

owned and operated LaSpina Salon, and was residing with his own fiancé. *Id.* at p. 3 ¶¶ 5, 7, p. 4

¶ 9, p. 7 ¶ 28. The parties had stipulated that the Debtor earned \$160,000 per year from LaSpina

Salon. *Id.* at p. 8 ¶ 3. The Special Master also discussed the circumstances surrounding the sale

of the Marital Residence in this section of the Report, as well as the fact that post-separation, Ms.

Stewart had incurred approximately \$35,000 in credit card debt and, separately, \$120,000 in

counsel fees which largely resulted from the Debtor's refusal to produce documentation relating

to secret accounts solely within his possession and control, forcing Ms. Stewart to file numerous

motions to compel, requests for sanctions, and subpoenas, mostly to no avail. *Id.* at p. 4 ¶ 11, p. 5

¶ 12, p. 6 ¶¶ 15, 18, 19, 22-24, 26, p. 11-12, p. 28.

Under the section of the Report entitled "Alimony," the Special Master explained

"[w]ife's request for alimony was not pursued as she is cohabiting with her fiancé. Her claim for

---

[2] As previously mentioned, there was a child support order in place. July 23 Tr. 20:22-21:2, 56:4-6, 59:5-6, 68:2-23. The terms of the child support order were not referenced in the Report. Additionally, other than the Debtor's \$17,000 arrears as of August 2006, the Report does not further discuss Debtor's compliance with the child support order. Nevertheless, the Debtor appears to have paid child support, albeit, not always consistently. *Id.* at 20:25-21:2, 56:4-9, 68:13-69:1. Ultimately, the Debtor's child support obligation is not at issue in this proceeding. Obj. ¶ 8; Resp. to Obj. ¶ 8.

[3] The Report notes that Ms. Stewart "has worked two part-time jobs since she suffered a brain injury a few years back as a result of a collision with a dog." Ex. C-1 p. 3 ¶ 6.

alimony is therefore denied and dismissed." *Id.* at p. 28. Because Ms. Stewart chose not to

pursue alimony, she did not provide the Special Master with any information about her personal

expenses. *Id.* at p. 8 ¶ 3.

In the section of the Report entitled "Division of Property – Marital Property and

Equitable Distribution," the Special Master weighed factors deemed relevant by 23 Pa.C.S.A.

§3502(a)[4] to equitably dividing marital property, including the length of the parties' marriage,

their employment histories, Ms. Stewart's role as the primary caregiver of their son, the parties'

earning capacities, the contribution of marital property into LaSpina Salon, Debtor's dissipation

of the value of the Marital Residence by failing to make mortgage/child support payments, Ms.

Stewart's post-separation debt, and the parties' income disparity. *See id.* at p. 7-11.

In weighing these factors, the Special Master recognized that the Debtor was in a "far

superior position given his income, after consideration of taxes actually paid, is over four times

---

[4] 23 Pa.C.S.A. § 3502(a) provides that:
    [u]pon the request of either party in an action for divorce or annulment, the court shall equitably divide,
distribute or assign, in kind or otherwise, the marital property between the parties without regard to marital
misconduct in such percentages and in such manner as the court deems just after considering all relevant
factors. The court may consider each marital asset or group of assets independently and apply a different
percentage to each marital asset or group of assets. Factors which are relevant to the equitable division of
marital property include the following:
    (1) The length of the marriage.
    (2) Any prior marriage of either party.
    (3) The age, health, station, amount and sources of income, vocational skills, employability, estate,
liabilities and needs of each of the parties.
    (4) The contribution by one party to the education, training or increased earning power of the other party.
    (5) The opportunity of each party for future acquisitions of capital assets and income.
    (6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or
other benefits.
    (7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or
appreciation of the marital property, including the contribution of a party as homemaker.
    (8) The value of the property set apart to each party.
    (9) The standard of living of the parties established during the marriage.
    (10) The economic circumstances of each party at the time the division of property is to become effective.
    (10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or
assigned, which ramifications need not be immediate and certain.
    (10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need
not be immediate and certain.
    (11) Whether the party will be serving as the custodian of any dependent minor children.

greater than Wife's income." *Id.* at p. 9 ¶ 5. She also recognized that the "[w]ife has incurred

debt of approximately $150,000 post-separation in the form of credit card debt and attorney fees.

Husband is in a superior position as he retains the business which has a significant non-marital

component." *Id.* at p. 10 ¶ 8. Furthermore, the Special Master concluded that "given the

proximity of the parties' separation to the opening of the salon, it is Husband who reaps the

benefits, particularly as it appears that marital funds were used to fund the new salon." *Id.* at p.

10 ¶ 7.

Accordingly, under the section of the Report entitled "Division of Marital Property –

Summary and Equitable Distribution of Marital Property," the Special Master determined:

> [t]his is a ten year [sic] marriage wherein Husband out-earns Wife by more than
> four times over. Husband came into the marriage with an existing business, which
> was significantly enhanced shortly before separation. The testimony revealed that
> approximately $160,000 went into the new salon within months of separation. As
> a line of credit only exists for approximately $50,000, the assumption is the
> remainder of funds came from marital sources. Husband will continue to reap
> these benefits. It is also recognized that if and when the business is sold, there
> may be capital gain consequences. Based upon all of the foregoing, it is
> recommended that the marital component of the business be divided 57% to Wife
> and 43% to Husband. The remainder of the marital estate shall be divided 60% to
> Wife and 40% to Husband. *Id.* at p. 25.

In the same section, the Special Master valued the marital portion of LaSpina Salon at $350,878

and charged Debtor with possession of this amount. *Id.* at p. 23-26. As for the remainder of the

marital estate, the Special Master charged Ms. Stewart with possession of the following marital

assets: (1) her Jaguar, which she had sold for $4,000; (2) her Wachovia account with a separation

date value of $553.41; (3) her Morgan Stanley IRA, which she had cashed in post-separation,

valued at $5,136.60 as of April 30, 2005; and (4) her NY Life insurance policy, which she had

liquidated on June 27, 2005, valued at $5,902.05. *Id.* at p. 6 ¶¶ 16, 17, 20, 21, p. 25.

The Special Master charged Debtor with possession of the following assets of the marital estate, many of which he had kept hidden from Ms. Stewart during their marriage and post-separation until the divorce proceedings, and liquidated prior to Trial: (1) Debtor's Wachovia account with an April 15, 2005 balance of $6,695.49; (2) Debtor's Commerce Bank account with a $10.00 value; (3) Debtor's Scottrade IRA, which he had cashed out post-separation, valued at $7,080.89; (4) an "MFS purchase pension plan" with a March 31, 2006 value of $940.44; (5) a NY Life policy ending in x992 which the Special Master assigned a marital value of $88,980.39;[5] (6) Debtor's NY Life annuity account ending in x021 valued at $11,256.96 as of April 1, 2003; (7) Debtor's NY Life whole life policy ending in x047 which the Special Master assigned a marital value of $2,508.41; (8) a NY Life variable annuity account ending in x753 which Debtor surrendered on December 1, 2006 for $4,347.72; (9) a NY Life policy ending in x658 with a marital value of $4,317.35; (10) Debtor's Putnam account with a March 31, 2003 value of $5,810.94; (11) Debtor's two Vanguard accounts with a May 2003 value of $3,426.37; (12) a MetLife account with a marital component of $9,963.25; (13) a Seligman IRA assigned a value of $84.05; (14) a Prudential life insurance policy assigned a value of $1,614.21; and (15) an Allianz policy with an October 2000 value of $14,128.69.[6] *Id.* at p. 6 ¶¶ 18, 19, 22, 23, p. 11-16, p. 26.

From the Debtor's portion of the marital estate, the Special Master recommended that the Debtor pay Ms. Stewart $290,462.73 cash in 120 consecutive monthly payments of $2,420.52 plus interest at the legal rate to be compounded annually ("Award"). *Id.* at p. 25-27. The Award represented 57% of the value of the marital portion of the salon and 60% of the value of the

---

[5] Debtor was only charged with receipt of $62,208.04. Ex. C-1 p. 13 ¶ 1.
[6] Debtor provided very limited documentation of these assets which were solely in his possession and control, forcing the Special Master to make valuations of these assets based upon outdated documentation. Ex. C-1 p. 11-16.

remainder of the marital estate, less the marital assets already in Ms. Stewart's possession. *Id.* at

p. 25-26. In describing the terms of the Award, the Report explained that "[t]hese payments are

in equitable distribution and are not taxable to Wife nor are the payments deductible from the

income of Husband." *Id.* at p. 27. Finally, under the section of the Report entitled "Attorneys'

Fees," the Special Master recommended that the Debtor be ordered to pay Ms. Stewart's counsel

$20,000 of the $120,000 in counsel fees she had incurred due largely to Debtor's refusal to

produce information about his secret accounts, which caused her to incur more legal fees than

she ordinarily would have. *Id.* at p. 28.

On February 23, 2009, the State Court entered the divorce decree, which incorporated

and adopted the findings and recommendations contained in the Report ("Divorce Decree"). *See*

Obj. Ex. A Decree p. 1-4; July 23 Tr. 54:8-12. The Divorce Decree discussed the Award in a

section labeled "Equitable Distribution" and addressed the voluntary dismissal of Ms. Stewart's

alimony request in a section labeled "Alimony." Obj. Ex. A Decree p. 1-4. In a section labeled

"Attorneys' Fees and Costs," the Divorce Decree further ordered the Debtor to pay Ms. Stewart's

counsel the $20,000 of counsel fees recommended by the Special Master. *Id.* at p. 4. The Debtor

subsequently satisfied his obligation to pay this portion of Ms. Stewart's counsel fees. July 23 Tr.

54:16-55:2.

On April 19, 2010, in response to Ms. Stewart's "Petition for Enforcement of Agreement,

Enforcement of Court Order and for Contempt," the State Court found Debtor in contempt for

failure to make payments due under the Divorce Decree. Ex. C-2 ¶ 1. As a result, the State Court

ordered the Debtor to abide by an agreement the parties had entered into on September 29, 2009

providing that (1) through September 1, 2010, the Debtor would make payments to Ms. Stewart

on the first day of each month in the amount of $1,020 and (2) that starting October 1, 2010, the

Debtor would pay Ms. Stewart monthly payments of $3,807.66 in accordance with an attached

amortization schedule until the balance due was paid in full ("Enforcement Order"). *Id.* at ¶¶ 3,

4. The Enforcement Order also required the Debtor to provide Ms. Stewart with a life insurance

policy naming her as the beneficiary in an amount equal to the total amount due pursuant to the

Divorce Decree. *Id.* at ¶ 5.

Going forward, the Debtor struggled to maintain his business and pay Ms. Stewart. June

4 Tr. 21:19-22:13. Accordingly, on February 14, 2018, the Debtor filed a voluntary petition

under chapter 13 of the Bankruptcy Code. Case No. 18-11012 ECF 1. Shortly thereafter, in or

around March 2018, the Debtor gave up LaSpina Salon, which he had relocated to a smaller

facility about a year prior, and moved to Florida to care for his aging parents. June 4 Tr. 9:3-10,

10:4-12, 22:1-5; July 23 Tr. 72:1-8, 77:13-15. On April 11, 2018, Ms. Stewart filed a proof of

claim in the amount of $91,948.18, the alleged balance due under the Award as of the petition

date, characterizing her claim as a priority claim for a domestic support obligation pursuant to 11

U.S.C. § 507(a)(1)(A).[7] POC 1-1 Pt. 2 ¶ 12.

On October 13, 2018, the Debtor filed an objection to the Claim, disputing Ms. Stewart's

characterization of the Claim as a domestic support obligation and seeking a determination that

the Award was dischargeable as an equitable distribution obligation.[8] Case No. 18-11012 ECF

35 Obj. ¶¶ 5, 7, 11, 12. On January 8, 2019, Ms. Stewart filed a response in opposition to the

Debtor's Claim objection, maintaining her position that her Claim is entitled to priority status as

a domestic support obligation. Case No. 18-11012 ECF 43 Resp. to Obj. ¶¶ 3, 7, 10, 11. After

---

[7] Ms. Stewart attached the Enforcement Order as evidence of her claim. *See* POC 1-1 Attachment 1.
[8] The Claim objection only seeks a determination regarding the priority and dischargeability of Ms. Stewart's Claim as opposed to the validity or amount of the Claim. Obj. ¶¶ 5, 9-12; Suppl. Br. 1, 6. Neither the Debtor nor Ms. Stewart has put the amount or validity of Ms. Stewart's Claim at issue.

continuing hearings on the Claim objection multiple times at the request of the parties, the Court held hearings on the Claim objection on June 4, 2019 and July 23, 2019. Case No. 18-11012 ECF 53, 56. At the July 23 hearing, counsel for Ms. Stewart acknowledged that at least part of the Award could be considered an equitable distribution obligation.[9] July 23 Tr. 60:18-61:7.

As of the summer 2019 hearings, the Debtor was working part-time as a hairstylist making around $300/week and living with his girlfriend. June 4 Tr. 8:21-24, 9:15-21; July 23 Tr. 73:9-12. At that time, he owned no real estate and had no more than $3,000-$4,000 in his bank account. June 4 Tr. 26:13-15, 20-21; July 23 Tr. 72:18-19.

At the conclusion of the July 23 hearing, the Court invited the parties to submit supplemental briefing. The Debtor, after seeking and obtaining an extension of the briefing schedule, filed a supplemental brief on September 20, 2019. Case No. 18-11012 ECF 59, 60, 64. Ms. Stewart filed a response on October 18, 2019. *Id.* at ECF 67. The Court has reviewed the submissions and the matter is now ripe for disposition.

## III.    DISCUSSION

The Debtor argues that the Claim cannot be classified as a domestic support obligation, because the Special Master did not award Ms. Stewart alimony, maintenance, or support. Obj. ¶12. Instead, he argues that the Claim should be classified as an equitable distribution obligation because the Special Master only intended to divide the parties' marital property. *Id.* at ¶¶ 4, 11. Ms. Stewart, on the other hand, argues that part of the Claim should be classified as a domestic

---

[9] THE COURT: So is it your argument that he said that she was basically owed X thousands of dollars in spousal support, and then that's what's being paid out over time? This is all spousal support?
MR. RUF: No, it's not all spousal support, it's the business and also it was the EQ, and also it was spousal support and potentially alimony. Just because she didn't make the specific claim of alimony doesn't mean that, you know, it doesn't mean that that's not part of what this is. It's part of a support payment in general.
THE COURT: Do you acknowledge that part of this award could be considered property settlement, but part of it could also be considered spousal support and possibly now alimony, you're saying?
MR. RUF: Yes.
July 23 Tr. 60:18-61:7

support obligation because the Special Master intended to give her the Award in lieu of alimony and to provide her with additional financial support. Resp. to Obj. ¶¶ 3, 10, 11. *See* July 23 Tr. 60:18-61:7.

After reviewing the factors used by the Special Master to craft the Award of equitable distribution under 23 Pa.C.S.A. § 3502(a) and her statements in the Report, the Court finds that the Special Master's primary intent in crafting the Award was to equitably divide the parties' marital property. However, the Court also finds that the Special Master intended part of the Award to serve as a domestic support obligation to Ms. Stewart, given her concern for the significant income disparity between the parties. The Court therefore concludes that two-thirds of the Claim will be characterized as an equitable distribution obligation which will be treated as a general unsecured claim subject to discharge, and one-third of the Claim will be characterized as a domestic support obligation which will be treated as a nondischargeable, priority unsecured claim.

### A. Applicable Legal Principles

Section 507(a) of the Bankruptcy Code "sets forth ten categories of expenses and claims that are entitled to priority payment in a bankruptcy case." *In re Anthony,* 453 B.R. 782, 785 (Bankr. D. N.J. 2011). *See* 11 U.S.C. § 507(a). Pursuant to 11 U.S.C. § 507(a)(1)(A), "[a]llowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition in a case under this title, are owed to or recoverable by a spouse, former spouse, or child of the debtor…" have first priority. Additionally, 11 U.S.C. § 523(a)(5) renders debts incurred for a domestic support obligation nondischargeable.

Under 11 U.S.C. § 101(14A), the Bankruptcy Code defines a "domestic support obligation" as:

a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is--

(A) owed to or recoverable by--

(i) a spouse, former spouse, or child of the debtor…;

(B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

(C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of--

(i) a separation agreement, divorce decree, or property settlement agreement;

(ii) an order of a court of record; or

(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

It is clear that the Award in this case is owed to the Debtor's former spouse, the obligation was established in a divorce decree entered before the order for relief, and the Award has not been assigned. *See* 11 U.S.C. § 101(14A)(A)-(D). Accordingly, whether the Award constitutes a domestic support obligation depends on whether the Award is in the nature of alimony, maintenance, or support. *See* 11 U.S.C. § 101(14A)(B).

In *Gianakas v. Gianakas (In re Gianakas),* 917 F.2d 759 (3d Cir 1990), the Third Circuit Court of Appeals ("Third Circuit") declared that "whether the obligation is in the nature of alimony, maintenance or support for purposes of the Bankruptcy Code is a question of federal, not state, law." 917 F.2d at 762. Accordingly, a debt could still be "in the nature of support" even though it would not legally qualify as alimony or support under state law. *Id.* Ultimately, courts must look beyond the label attached to an obligation to examine its true nature.[10] *Id.*

---

[10] In making this determination, it is important to note that "there is no federal domestic relations law nor could Congress have intended to transform the bankruptcy court into a federal divorce forum." *Buccino v. Buccino,* 580 A.2d 13, 17 (Pa. Super. Ct. 1990).

By way of background, "alimony, maintenance, and support" generally refer to obligations of one spouse to make payments to the dependent spouse in order to provide continuing financial support to enable the dependent spouse to meet his or her basic needs and/or maintain his or her pre-separation standard of living. *See e.g., Tyndall v. Tyndall (In re Tyndall),* 360 B.R. 68, 71 (Bankr. D. Del. 2007) (debtor's obligation to make regular payments to his former spouse in lieu of her interest in debtor's business was contemplated to allow former spouse to meet necessary living expenses and was found to serve a support function); *Marker v. Marker (In re Marker),* 139 B.R. 615, 622-23 (Bankr. W.D. Pa. 1992) (finding debtor's obligation to pay former spouse her share of debtor's business in one lump sum by a certain date constituted support and maintenance under federal law because circumstances reflected it was intended to enable debtor's former spouse to obtain life's daily necessities and maintain the marital residence); *Pollock v. Pollock (In re Pollock),* 150 B.R. 584, 589 (Bankr. M.D. Pa. 1992) (debtor's assumption of obligation to pay second mortgage on marital residence was considered support because it was intended to facilitate maintenance of dependent former spouse's housing); *Smith v. Smith,* 904 A.2d 15, 20 (Pa. Super. Ct. 2006) ("the purpose of alimony is to ensure that the reasonable needs of the person who is unable to support himself or herself…are met. Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage…") (citations omitted).

In contrast, property settlements stemming from the division of marital assets in divorce proceedings without regard for either spouse's need for financial support are considered to be in the nature of equitable distribution. *See e.g., Shirey v. Shirey,* No. 97-CV-7818, 1998 WL 107031, at *4-5 (E.D. Pa. Mar. 11, 1998) (finding debtor's obligation to compensate his former spouse for rental value of jointly-owned property where debtor resided post-separation without

paying mortgage to be in the nature of equitable distribution due to the state court's lack of

consideration for any financial need of the former spouse in imposing the obligation); *Mannix v.*

*Mannix (In re Mannix),* 303 B.R. 587, 594-95 (Bankr. M.D. Pa. 2003) (debtor's obligation to

reimburse his former spouse for a loan used to pay creditors of debtor's business did not

constitute alimony, maintenance, or support as demonstrated by the lack of evidence that the

former spouse would be unable to meet her needs in the absence of debtor's reimbursement for

and further assumption of the loan); *Rankin v. Alloway (In re Alloway),* 37 B.R. 420, 426 (Bankr.

E.D. Pa. 1984) ("unless…the debt is more akin to alimony, maintenance or support rather than a

mere distribution of property, the debt will be discharged.").

 Ultimately, in considering the types of obligations which constitute "alimony,

maintenance or support," the Third Circuit in *Gianakas* held that "[w]e believe that whether an

obligation is in the nature of alimony, maintenance or support, as distinguished from a property

settlement, depends on a finding as to the intent of the parties at the time of the settlement

agreement." *Gianakas,* 917 F.2d at 762. Where the controlling document is a family court order,

such as a divorce decree, the bankruptcy court must look to the intent of the underlying court at

the time the order was entered. *Shirey,* 1998 WL 107031, at *3; *In re Marker,* 139 B.R. at 621

n.2 ("the analysis set forth in *Gianakas* applies with equal force to [a decree issued by a court].

The only salient difference is that the intent to be ascertained is that of the state court rather than

that of the parties to the divorce proceeding."); *In re Pollock,* 150 B.R. at 588. When, as in the

instant case, a family court adopts recommendations of a master in divorce, the bankruptcy court

looks primarily to the master's report to determine the nature of the obligation in question.

*Shirey,* 1998 WL 107031, at *3.

Ultimately, *Gianakas* instructed that intent can be determined by examining three principal factors:

> [f]irst, the court must examine the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary. However, it is likely that 'neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose.' Therefore, the parties and the state courts may not have focused on whether a particular obligation was to serve as support or as a property settlement unrelated to support. As the Pennsylvania Superior Court noted, even an obligation designated as property settlement may be related to support because state courts often will adjust alimony awards depending on the nature and amount of marital assets available for distribution. In fact, 'property division often achieves the same goal as alimony, *i.e.,* support.'
>
> Because the language of the agreement alone may not provide a sufficiently conclusive answer as to the nature of an obligation, the second indicator to which we must look to assist in ascertaining the parties' intent is the parties' financial circumstances at the time of the settlement. The facts that one spouse had custody of minor children, was not employed, or was employed in a less remunerative position than the other spouse are aspects of the parties' financial circumstances at the time the obligation was fixed which shed light on the inquiry into the nature of the obligation as support.
>
> Third, the court should examine the function served by the obligation at the time of the divorce or settlement. An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support. *Gianakas*, 917 F.2d at 762-63 (citations omitted).

Based upon the foregoing, the Court will review the language and substance of the Report, the parties' financial circumstances at the time the Report was issued, and the function of the Award.

## B.  Language and Substance of the Special Master's Report/Divorce Decree

The language and much of the substance of the Report and Divorce Decree[11] initially

support the Debtor's position that the Special Master viewed the Award as one of equitable

distribution rather than support. As previously mentioned, the Report and Divorce Decree plainly

state that "[t]hese payments are in equitable distribution and are not taxable to Wife nor are the

payments deductible from the income of Husband" and that "[w]ife's request for alimony was

not pursued as she is cohabiting with her fiancé. Her claim for alimony is therefore denied and

dismissed." Ex. C-1 p. 27-28; Obj. Ex. A Decree p. 3-4.

Furthermore, the Report discusses the factors informing the Award in a section titled

"Division of Property – Marital Property and Equitable Distribution," and the terms of the

Award in a section entitled "Division of Property – Summary and Equitable Distribution of

Marital Property." *See* Ex. C-1 p. 7, 11. In the "Summary and Equitable Distribution of Marital

Property" section, the Report calculates the total value of the marital estate based upon the assets

held by each of the parties and the percentage of the total marital estate that the Debtor must pay

to Ms. Stewart.[12] *Id.* at p. 11-26. Similarly, the Divorce Decree sets out the terms of the Award

and the list of marital property to be divided in a section labeled "Equitable Distribution." Obj.

Ex. A Decree p. 1-3.

---

[11] Because the Report and Divorce Decree are the documents which gave rise to the Award, they control the determination of whether the Award is in the nature of support, not the Enforcement Order. By the time the Enforcement Order was entered, the nature of the Award had already been *established by the Report and Divorce Decree*. Thus, the fact that the Debtor and Ms. Stewart may have stipulated to certain terms incorporated into the Enforcement Order which would allow the Debtor to cure his arrears does not change the nature of the Award which was established by the Report and Divorce Decree.

[12] In Ms. Stewart's post-hearing supplemental brief, she appears to suggest that the Debtor's $17,000 support arrears dating back to August 2006 "were incorporated into the ultimate settlement." Br. in Opp. p. 4. The Court has reviewed the Report closely and, while the Special Master certainly considered the Debtor's dissipation of the Marital Residence by failing to pay child support and the mortgage, nowhere does the Special Master recommend that the Debtor cure the $17,000 arrears through the Award. Accordingly, it does not appear from the Report that the Debtor's $17,000 support arrears were "incorporated" into the Award.

Although the Special Master characterizes the Award as one of equitable distribution throughout the Report, the factors actually used by the Special Master to determine the appropriate division of the marital estate pursuant to 23 Pa.C.S.A. § 3502(a) relate to both domestic support obligations as well as equitable distributions. For instance, the following factors considered by the Special Master under § 3502(a) reflect concerns related to support and maintenance rather than property division:

> (3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.
> (4) The contribution by one party to the education, training or increased earning power of the other party.
> (5) The opportunity of each party for future acquisitions of capital assets and income.
> (6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.
> (9) The standard of living of the parties established during the marriage.
> (10) The economic circumstances of each party at the time the division of property is to become effective.

On the other hand, other factors under § 3502(a) relate primarily to property division, such as:

> (7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.
> (8) The value of the property set apart to each party.

In addition, as discussed *supra*, the court must look beyond labels attached to an obligation. *Gianakas*, 917 F.2d at 762. *See In re Tyndall*, 360 B.R. at 71-72 (an obligation labeled "not alimony" in a property settlement agreement and which was to be made "in lieu of [wife's] interest in the Business" was nevertheless in the nature of support). As previously discussed, under appropriate circumstances, an obligation could be "in the nature of support" even though it would not legally qualify as alimony or support under state law. *Gianakas*, 917

F.2d at 762. Based upon the foregoing, it is clear that the Special Master's characterization of the Award as one of equitable distribution under § 3502(a) must be parsed further in order to determine what her true intent was in crafting the Award.

### C. Financial Circumstances of the Parties at the Time of Trial

The Report reflects that the Special Master did consider, to a certain extent, the parties' financial circumstances, including that "[h]usband out-earns Wife by more than four times over," "is in a far superior position given his income," and maintained a significant non-marital component of LaSpina Salon.[13] Ex. C-1 p. 9 ¶ 5, p. 10 ¶ 8, p. 25. In addition, as noted in the Report, Ms. Stewart had accumulated $35,000 of credit card debt and, separately, approximately $120,000 in attorney's fees related to the divorce, had previously been unable to pay the mortgage on the Marital Residence without the Debtor's assistance, and maintained primary custody of the minor child, for which she was supposed to receive child support. *Id.* at p. 4 ¶ 11, p. 6 ¶ 26, p. 7 ¶ 27.

However, the Special Master had no information about Ms. Stewart's ongoing expenses. *Id.* at p. 8 ¶ 3. In fact, even though she earned less than the Debtor, she did not specifically seek spousal support, alimony pendente lite, or alimony. *Id.* at p. 28; June 4 Tr. 22:20-22; July 23 Tr. 29:19-24. At the time of the Trial, she enjoyed employment as an LPN and resided with her fiancé, an accountant who purchased the Marital Residence for over $350,000 so that she could continue to live there. Ex. C-1 p. 3 ¶ 6, p. 5 ¶ 12, p. 7 ¶ 28, p. 8 ¶ 3; July 23 Tr. 41:9-10. While it is clear that Ms. Stewart's financial circumstances were a consideration for the Special Master in

---

[13] Under Pennsylvania law, because the Debtor opened LaSpina Salon in his own name prior to the marriage, the marital component of the Salon is only the appreciation in value of the business during the marriage. 23 Pa.C.S. §3501(a)(1) (defining "marital property" as "all property acquired by either party during the marriage and the increase in value of any nonmarital property" acquired prior to the marriage). Thus after the divorce proceedings, Debtor retained the remainder of the business's value as nonmarital property.

the Report, they were not the focus of the Report. As noted above, much of the Report was

focused on the value and division of the marital property.

### D. Function Served by the Award

Finally, the Court considers the intended function of the Award. As the Third Circuit

stated in *Gianakas*, "an obligation that serves to maintain daily necessities such as food, housing

and transportation is indicative of a debt intended to be in the nature of support." *Gianakas*, 917

F.2d at 763. Other factors also shed light on the intended function of an obligation stemming

from a divorce. For instance, that an obligation is payable in installments generally signals that

the obligation functions to provide support. *Gianakas v. Gianakas (In re Gianakas)*, 112 B.R.

737, 742 (W.D. Pa. 1990). Similarly, courts tend to find obligations which terminate upon a

condition or the death or remarriage of the recipient spouse as in the nature of support. *Shaver v.*

*Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984); *In re Gianakas*, 112 B.R. at 742.

Conversely, courts tend to view obligations which remain consistent regardless of

changes in the recipient spouse's circumstances as true property settlements. *Shaver,* 736 F.2d at

1316. In determining the intended function of an obligation, some courts have also considered

whether "the debt was allocated in lieu of a greater allowance of alimony" and "whether the

support award would be inadequate absent the assumption" of a debt like a mortgage. *In re*

*Alloway,* 37 B.R. at 425.

Here, because the Special Master had no knowledge of Ms. Stewart's specific expenses

other than the $35,000 of general credit card debt and $120,000 of counsel fees, this Court has no

basis upon which to conclude that the intended function of the Award was to help Ms. Stewart

maintain her basic, daily necessities such as food, housing, and transportation. The Special

Master, therefore, could not have intended the Award to assist Ms. Stewart in meeting her daily

19

necessities if she had no idea what her daily necessities were or how much they cost, nor was there any suggestion in the Report that Ms. Stewart could not meet her basic needs at the time of Trial.

In addition, although the Award is payable in installments, the reality is that, with few remaining assets besides LaSpina Salon, the Debtor would have been unable to pay Ms. Stewart her portion of the marital estate in a lump sum without selling the business he had recently renovated and expanded. July 23 Tr. 55:9-18. Therefore, the installment structure appears to have been driven purely by practical considerations.[14] Additionally, the fact that the Award would not terminate upon Ms. Stewart's remarriage or death suggests that it was not primarily intended to serve a support function.

Furthermore, while Ms. Stewart argues that the Special Master awarded her equitable distribution payments in lieu of alimony, the reality is that she simply would not have qualified for alimony under Pennsylvania law because she was cohabiting with her fiancé at the time of Trial. *See* 23 Pa.C.S.A. § 3706 ("No petitioner is entitled to receive an award of alimony where the petitioner, subsequent to the divorce pursuant to which alimony is being sought, has entered into cohabitation with a person of the opposite sex who is not a member of the family of the petitioner within the degrees of consanguinity."). While the Award could still serve as support under federal law, the Special Master could not have intended to have the equitable distribution payments *replace* an award of alimony which Ms. Stewart would have never qualified for in the first place. In any event, the Report itself lacks any express indication suggesting that the Special Master intended to award equitable distribution in lieu of alimony.

---

[14] As previously mentioned, most of the marital accounts which Debtor was charged with possession of had been liquidated prior to the divorce Trial. Ex. C-1 p. 26.

20

Moreover, it appears unlikely that the Special Master would have intended this Award to *primarily* serve a support function when Ms. Stewart was gainfully employed, received at least some child support, and resided with another professional who had provided her with housing, especially given that Ms. Stewart had never sought spousal support or alimony pendente lite during the divorce proceedings. *See* Ex. C-1 p. 3 ¶ 6, p. 5 ¶ 12, p. 7 ¶ 28; June 4 Tr. 22:20-22; July 23 Tr. 20:22-21:2, 29:19-24, 56:4-6, 59:5-6, 68:2-23.

As discussed *supra,* the Report is primarily focused on the division of the marital property held by each party. In addition, the Special Master was concerned about compensating Ms. Stewart for the Debtor's substantial investment of marital property into LaSpina Salon prior to the divorce and the Debtor's concealment and dissipation of marital property prior to Trial. All of these factors reflect the Special Master's intent to divide the marital property in a manner consistent with traditional principles of equitable distribution.

Ultimately, the Special Master inventoried and valued the parties' marital assets, including the appreciation in value of LaSpina Salon, and determined how to fairly divide those assets. Ex. C-1 p. 12-27. In particular, the Special Master recognized the injustice of allowing only the Debtor to "reap the benefits" of the investment of substantial marital assets shortly before separation into LaSpina Salon without compensating Ms. Stewart. *Id.* at p. 4 ¶ 9, p. 10 ¶ 7 ("given the proximity of the parties' separation to the opening of the salon, it is Husband who reaps the benefits, particularly as it appears that marital funds were used to fund the new salon."), n. 7, ¶ 8, p. 16 ¶ 14, p. 25.

At its core, therefore, this Award appears to primarily function as a division of the parties' marital assets in order to (1) compensate Ms. Stewart for her investment of marital property into the renovation of LaSpina Salon by giving her a fair portion of the marital value of

the Salon and (2) ensure she received a fair share of the marital assets that the Debtor had hidden

from her and liquidated prior to Trial. In light of the foregoing, the Court finds that this third

factor weighs in favor of the Debtor's position that this Award was, for the most part, intended to

effectuate a fair and equitable division of the marital property.

Nevertheless, the Court cannot ignore the Special Master's concern for the disparity in

the parties' income and earning potential and the post-separation credit card debt Ms. Stewart

had incurred presumably in order to provide for herself and her son. Even without documentation

of Ms. Stewart's ongoing expenses, the Special Master recognized Ms. Stewart's financial

vulnerability comparative to the Debtor's. It is undeniable that the disparity in the parties'

earning capacity, income, and financial circumstances was a partial justification for the Award.[15]

Ex. C-1 p. 9 ¶ 5, p. 25. Therefore, this Court cannot conclude that the Award did not serve *any*

support function.[16] Most likely, as Ms. Stewart's counsel acknowledged, the Award was meant

to be some hybrid of equitable distribution and support. Based upon the Special Master's

consideration of Ms. Stewart's weaker financial position, it appears that the Special Master

intended the Award to provide at least some support for Ms. Stewart given the disparity in

income and earning capacity between her and the Debtor. *See Mendez v. Mendez (In re Mendez),*

275 B.R. 482, 489 (Bankr. W.D. Pa. 2001).

---

[15] While the Special Master's prediction of the Debtor's earning capacity unfortunately did not prove correct, it is the circumstances at the time the order was issued which matter to the Court's determination regarding whether the Award is in the nature of support, not the present circumstances. *Brown v. Mills (In re Mills),* 313 B.R. 395, 399 (Bankr. W.D. Pa. 2004). The Debtor's current financial circumstances, therefore, are irrelevant to the resolution of the issues hereunder.

[16] Although Ms. Stewart would not have technically qualified for alimony due to her cohabitation with Mr. Bruno, that does not foreclose the possibility that the Special Master could have intended the Award to function, at least in part, as support for Ms. Stewart. The fact that a party is not entitled to alimony or spousal support under state law does not automatically mean that an award of property in a divorce does not actually function as support. *Lane v. Lane (In re Lane),* 267 B.R. 679, 683 (Bankr. D. Del. 2001). Even when state law does not provide for alimony, the bankruptcy court is not bound by the treatment of the obligation in state court. *Shaver,* 736 F.2d at 1316.

Based upon the foregoing, the Court concludes that two-thirds of the Award served as an equitable distribution of the parties' marital property and one-third of the Award served as a domestic support obligation in favor of Ms. Stewart. Accordingly, the Court will sustain the Debtor's objection to the Claim with regard to two-thirds of the Claim and overrule the Debtor's objection to the Claim regarding the remainder of the Claim.

## IV.    CONCLUSION

After weighing the three *Gianakas* factors, the Court concludes that the Debtor's Claim objection is sustained in part and overruled in part. One-third of the Claim is entitled to priority treatment pursuant to § 507(a)(1)(A) and is nondischargeable pursuant to § 523(a)(5) and two-thirds of the Claim is reclassified as a general unsecured claim subject to discharge.

Date: January 3, 2020

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge